1

2

3          **UNITED STATES DISTRICT COURT**

4       **FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

| | |
|---|---|
| 6   **IRINA ENGERT, ANNE ENGERT, and RON** | **1:13-CV-00126 LJO BAM** |
| **ENGERT, Individually and as Successors-in-** | |
| 7   **Interest to Glendon Engert,** | **REDACTED[1] MEMORANDUM** |
| | **DECISION AND ORDER RE** |
| 8               **Plaintiffs,** | **DEFENDANTS' MOTIONS FOR** |
| | **SUMMARY JUDGMENT (Docs. 102, 104** |
| 9        **v.** | **& 133)** |
| 10  **STANISLAUS COUNTY, et al.,** | |
| 11              **Defendants.** | |

12

13                    **I. <u>INTRODUCTION</u>**

14          On April 12, 2012, Deputies Robert Paris ("Paris") and Michael Glinskas ("Glinskas") of the

15  Stanislaus County Sheriff's Department were performing an eviction at 2141 Chrysler Drive, Unit #1 in

16  Modesto, California ("the Property"). A civilian locksmith, Glendon Engert ("Engert"), was present to

17  drill out the lock on the front door. During the course of the eviction, the tenant, Jim Richard Ferrario,

18  Jr. ("Ferrario"), shot and killed Paris and Engert. Engert's wife and parents (collectively, "Plaintiffs")

19  bring this lawsuit against Paris's estate, Glinskas, Sergeant Manuel Martinez ("Martinez") (Paris's and

20  Glinskas's direct supervisor), Lieutenant Cliff Harper ("Harper") (Martinez's supervisor), and the

21  County of Stanislaus (the "County"), alleging, among other things, that Defendants are liable under 42

22  U.S.C. § 1983 ("Section 1983") for violating Plaintiffs' Fourteenth Amendment rights to substantive due

23  process under the so-called "danger creation" exception/doctrine by placing Engert in the path of a

24  ────────────────

25  [1] This unredacted version of this Memorandum Decision and Order is docketed under seal pursuant to the Stipulated
    Protective Order entered August 5, 2014. Docs. 48 & 209.

                                          1

known danger with deliberate indifference to his personal, physical safety. *See generally* Doc. 37, Second Amended Complaint ("SAC"). Plaintiffs also bring a state law negligence/wrongful death claim against all Defendants. *Id*.[2]

Before the Court are three sets of motions for summary judgment:

(1) Paris and Glinskas move together for summary judgment that:

(a) the record does not support a danger creation claim;

(b) because the contours of the danger creation exception are not clearly established, Paris and Glinskas are entitled to qualified immunity;

(c) because there is no liability under the federal civil rights claim, there can be no liability for wrongful death; and

(c) no viable negligence claim can exist based on the facts of this case, and/or Paris and Glinskas are immune from liability for negligence. Doc. 102-1.

(2) Martinez moves separately for summary judgment that:

(a) he is not directly liable under any possible danger creation theory;

(b) he cannot be held liable on a supervisory liability theory because Plaintiffs cannot establish a sufficient causal connection between Martinez's conduct and any constitutional violation;

(c) he is entitled to qualified immunity because the contours of the danger creation exception, particularly when applied to Martinez's involvement, are not clearly established; and

(c) no viable negligence claim can exist in this case against Martinez and/or Martinez is immune from liability for negligence. Doc. 202.

---

[2] According to Defendants Paris and Glinskas, Plaintiffs have represented that they will be dismissing their state law cause of action for violations of California's Bane Civil Rights Act, Cal. Civ. Code § 52.1 *See* Doc. 102-1 at 1 n.2. Plaintiffs did not object or counter this assertion.

(3) Harper and the County[3] move separately for summary judgment that:

    (a) Harper cannot be directly liable because he was not personally involved in the eviction process;

    (b) Plaintiffs' supervisory liability claim against Harper cannot succeed because there was no underlying constitutional violation and/or because Plaintiffs cannot establish a sufficient causal connection between Harper's conduct and any constitutional violation;

    (c) qualified immunity protects Harper;

    (d) Harper cannot be held liable on Plaintiffs' state law negligence/wrongful death claims because they are not premised upon Harper's personal involvement and public servants cannot be held liable for the torts of their inferiors; likewise, because Plaintiffs' state law claims against the County are premised upon Harper's liability, the County is protected against liability under state law; and

    (e) the County is immune from liability under state law because Martinez, Glinskas, and Paris are immune. Doc. 131.

## II. FACTUAL BACKGROUND[4]

**A.**     **Background on Stanislaus County Civil Division and the Eviction Process.**

The Stanislaus County Sheriff's Department Civil Division ("Civil Division") provides a variety of civil process services, including evictions. Joint Statement of Undisputed Material Facts ("JUMF"), Doc. 104-2 ("JUMF") #1. As of April 12, 2012, the Civil Division included the following sworn personnel: Harper, Martinez, Paris, Glinskas, and Deputy Jennifer Humble ("Humble"). JUMF #4. As of that date, Deputy Glinskas had been assigned to the Civil Division for approximately three weeks.

---

[3] The parties stipulated to the dismissal of all federal claims against the County, Doc. 99, meaning that no *Monell* claims remain.

[4] The parties interpose numerous objections to evidence presented, both within the various statements of fact and in stand-alone objection memoranda. Docs. 195 & 204. The Court has reviewed all such objections and finds them to be immaterial or without merit unless a specific finding to the contrary is contained within this memorandum decision and order.

DUMF #3. The Civil Division is assisted by non-sworn Civil Legal Clerks. JUMF #5. As of April 12, 2012, the Supervising Clerk was Connie Watson ("Watson"); Sharman Juarez ("Juarez") was a Civil Legal Clerk. *Id.*

An "eviction" refers to the service and enforcement of a judgment of a Writ of Possession obtained by a property owner upon the completion of an unlawful detainer action in California Superior Court. JUMF #2. The eviction procedure consists of two main steps: the posting of the Notice of Eviction, commonly referred to as a Five Day Notice, and the service of the Notice of Restoration, wherein the property owner takes possession of the property. JUMF #3. The property owner normally gains access to the property by using their set of keys, or, where the property owner does not have keys, by hiring a locksmith to pick or drill, and ultimately change, the locks. Defendants' Undisputed Material Facts ("DUMF"), Doc. 194[5], ##1-2.

Civil Division policy provides:

> [D]eputies shall recognize that each eviction has the potential for becoming an emotional and dangerous situation.
>
> 1.      The enforcement of an eviction writ shall be accomplished by a team composed of two deputies.
>
> 2.      The deputies shall exercise officer safety when contacting the tenants or other involved individuals, when making entry into the property, and during the removal of the occupants.
>
> 3.      Every effort shall be made to defuse all hostile situations so that peaceful restoration of the property can be effected.

Stanislaus County Sheriff's Department Civil Unit Policies and Procedures No. 2.01 IV(A)(1), Declaration of Richard Schoenberger ("Schoenberger Decl."), Ex. 14, Doc. 155 at COUNTY 003142.

---

[5] Whenever the Court makes reference to a party's statement of material fact, it is specifically referring to the last version of that document filed. For example, as to the DUMF, the Court is referring to the County's and Harper's response to Plaintiffs' responses to Defendants' separate statement of undisputed material facts. Doc. 194. The Court notes that, confusingly, Defendants Paris and Glinskas filed their own response document containing substantially similar responses to those facts material to their case. Doc. 187-1. Because Paris and Glinskas's response does not appear to differ materially from that of the County's and Harper's, the Court will refer only to the former, more inclusive document.

**B.     Initiation of the Eviction Process.**

In late 2011, RT Financial purchased the Property in a foreclosure sale. JUMF #7. Roni Roberts ("Roberts"), the President of RT Financial, engaged Paul Tunison ("Tunison") of Patriot Eviction Services to assist with contacting the then-current occupant. JUMF ## 6, 8. Although Tunison discovered the occupant was Ferrario, Tunison never was able to make contact with Ferrario. DUMF #4.

RT Financial filed an unlawful detainer action in the Superior Court of California, County of Stanislaus, to regain possession of the Property and remove the current occupant. JUMF #9. Judgment was granted in favor of RT Financial on April 5, 2012, and RT Financial obtained a Writ of Possession. JUMF #10. Prior to April 5, 2015, the Stanislaus County Sheriff's Department played no role in and had no interaction with the Property or its occupant. DUMF #5.

On April 5, 2012, Tunison commenced the eviction process with the Civil Division. JUMF #12. Tunison provided a copy of the Writ of Possession to the Civil Division, filled out the initial information sheet, and paid the fee of $125.00. DUMF #6. The Notice of Eviction (Five Day Notice) was scheduled for posting on April 6, 2012. JUMF #13. Humble served the Five Day Notice on the Property on April 6, 2012. JUMF #14. No one answered the door to accept service, DUMF #8, so she posted the Notice on the door of the Property with tape. Martinez's Separate Statement of Undisputed Material Facts ("MUMF"), Doc. 203, #30. Deputy Humble did not note anything dangerous about the Property during the time she was completing the posting. DUMF #6.

**C.     Events Leading Up to the Eviction at the Property.**

The second step of the eviction, service of the Notice of Restoration, was scheduled for April 12, 2012. JUMF #15. To initiate the process, Civil Division Civil Legal Clerks contact the person identified on the information sheet the day before the scheduled lockout. JUMF #16. The Legal Clerk assigned to calls that day uses an "eviction questionnaire," which covers a series of questions about the property. *Id*. A "trip ticket" is prepared for the eviction, which is provided to the Deputies who will be completing the

eviction procedure. *Id.*

On April 11, 2012, Civil Clerk Juarez contacted eviction agent Tunison to communicate information about the scheduled eviction and to obtain information about the Property. JUMF #17. It is undisputed that Tunison communicated the following information to Juarez, which Juarez wrote down on the eviction questionnaire: (1) the occupant being evicted from the Property was ex-military; (2) there was a camera-video surveillance system at the Property; (3) the occupant had weapons, including M16-type guns; (4) there was an extra strength security door on the front of the residence; (5) the occupant was "possibly" violent; and (6) was a "weird weirdo." DUMF ## 9-10. Juarez wrote that information down on the eviction questionnaire. DUMF #12. It is undisputed that this was not an exhaustive list of the information Tunison provided Ms. Juarez. DUMF #10.[6]

Juarez made additional notes on the eviction schedule for April 12, 2012. DUMF #12. Next to the address line the Property, Juarez wrote the phrases "be very cautious" and "is going to have problems." *Id.* Following the completion of her call with Tunison, Juarez brought the information she recorded on the trip ticket to the attention of her supervisor, Watson. DUMF #14. Following Watson's directions, Juarez brought the information recorded on the eviction questionnaire from her call with Tunison to Martinez and showed it to him. DUMF ##15-16. Martinez told Juarez to highlight the information by circling it with red pen and to reprint the information on the opposite side of the trip ticket in black bold print. DUMF #18. Juarez complied. DUMF #19.

Martinez indicated that a Civil Division Clerk would come to him with information of this nature "once every other month, but it wouldn't -- it would be one or two of those items like subject dislikes law enforcement, is a gang member. Subject has access to weapons and is not law enforcement friendly,

---

[6] For example, Tunison also recalls having told Juarez that the Civil Division was "going to have a fire fight on [its] hands" in connection with this eviction, Deposition of Paul Tunison ("Tunison Depo.") at 136:2-5, and that the occupant had "hand grenades." *Id.* at 26:8. However, the Court does not believe the additional information Plaintiffs claim Tunison shared with Juarez is material to the outcome of this case because Juarez is not a Defendant, nor does Plaintiff claim any other party is liable for what Juarez did or did not do with any information she may or may not have received from Tunison. Only the information that was passed along to Defendants is relevant here.

et cetera, et cetera. It would be one or two items, things like that, or has dogs, you know, that are vicious." Deposition of Manuel Martinez ("Martinez Depo.") at 39:2-8; *see also* Martinez Decl. at ¶22 ("It was a common occurrence for the Civil Division to be informed that firearms may be at the presence where an eviction is scheduled...."). However, Martinez further indicated that he had asked a Civil Division Clerk to highlight information as he instructed Juarez to do perhaps once a year. *Id*. at 39:17-40:6.

Juarez taped the eviction questionnaire on the back of the trip ticket so that the information communicated by Tunison appeared twice, *i.e.*, on the back and front of one piece of paper. DUMF #20. That document is put into a "packet" and then provided to the assigned Deputies the day prior to the scheduled eviction. DUMF #21.

On the morning of April 12, 2012, a training meeting was scheduled for all Civil Division sworn staff. DUMF #23. Martinez and Watson led the meeting. DUMF #24. Harper, Glinskas, and Paris attended the meeting. DUMF #25. The meeting had many purposes, including to "make the whole unit...aware of...how they're supposed to be conducting these [evictions] formally"; and to educate Glinskas, who was "new to the unit and had never conducted evictions." Martinez Depo. 83:25-84:20.The eviction scheduled for the Property was not mentioned or discussed at the meeting. DUMF #26.

Paris and Glinskas were assigned to complete the eviction at the Property. JUMF #18. Juarez showed Paris the trip ticket and the questionnaire. Juarez Depo. at 103:24-104-11. Juarez recalls that Paris responded by saying, "whatever." *Id*. at 105:11.Glinskas reviewed the trip ticket in the car. DUMF #27. Glinskas recalls seeing highlighted information that the occupant may be ex-military, that video cameras were installed outside the residence, that the occupant may have guns ("M-16-type") and words to the effect of "be very cautious" or "is going to have problems." *Id*. According to Harper and Martinez, Deputies are given discretion whether to execute or abort an eviction in light of safety

7

concerns or other issues. DUMF #28.[7]

Glinskas considers every eviction high-risk until proven otherwise. MUMF #47. Glinskas did not believe the information on the trip ticket and questionnaire was particularly unusual in his law enforcement experience. DUMF #29. Glinskas served in the military for seven years and voluntarily completed SWAT school. DUMF #30. He believes lay people commonly misidentify long rifles as "M-16s" or other automatic weapons. DUMF #31. Therefore, the report of a rare automatic weapon did not cause him concern to approach the eviction any differently than previous evictions. DUMF #32. Upon learning that the occupant was a veteran, Deputy Glinskas believed that due to his own military background, that if Ferrario was present, he could persuade Ferrario to voluntarily leave the residence by relating to him "veteran-to-veteran." DUMF #33. He and Deputy Paris discussed the information on the way over to the Property. DUMF #34.

Roberts contacted Engert on the morning April 12, 2012, requesting locksmith services at the eviction. JUMF #19. Roberts testified that he had employed Engert to perform locksmith duties on properties over 100 times; in 80% of those jobs, Engert changed locks without the presence or assistance of law enforcement. MUMF #42. The two exchanged several text messages and spoke twice on the phone about the eviction. DUMF #35. Roberts took detailed, contemporaneous notes of each conversation on April 12, 2012. DUMF #36. Prior to those calls, Tunison communicated to Roberts that the potential occupant of the Property was an "armed weirdo" or "armed wacko," DUMF #37, but that "no one's ever seen him or talked to him." MUMF #43. The other details Tunison communicated to the Civil Division apparently were not communicated to Roberts prior to the eviction. *Id.* During their first phone conversation, Roberts informed Engert that the occupant might be an "armed weirdo" or "armed

---

[7] Plaintiff objects that Harper's and Martinez's statement that Deputies are given discretion to execute or abort an eviction in light of safety concerns is an improper expert opinion. DUMF #28. The Court disagrees. Harper's and Martinez's statements are based upon their own personal experience and knowledge as to whether Deputies are required to act in a certain way in response to certain circumstances, or whether they have discretion to respond as they see fit. The objection is OVERRULED.

wacko." DUMF #38. Roberts also told Engert not to start the eviction until Roberts arrived on scene. *Id*. Engert agreed. *Id*. During their second phone conversation, Engert advised Roberts that the Deputies were on the scene. DUMF #39. Roberts testified at his deposition that he told Engert, "if the guy is there, he is an armed wacko, weirdo," and "please do not start until I [Roberts] arrive," and "tell the Deputies I am running late and [am] just up the street." DUMF #39. Engert indicated to Roberts that he understood Roberts's directions. *Id*.

**D.      The Eviction.**

        Deputies Paris and Glinskas arrived at the Property early. DUMF #40; Glinskas Depo. at 110:17-19. Once the deputies parked, an individual came up on the right passenger side of the car. DUMF #42. The individual identified himself as the locksmith, Engert. *Id*. Deputy Paris asked Engert where the property owner was, and Engert explained he was on his way. DUMF #43. Stanislaus County Sheriff's Department Policy requires deputies to wait "a minimum of ten minutes for the owner's agent to arrive." Plaintiffs' Statement of Undisputed Fact ("PUMF"), Doc. 193, #121. According to Martinez, the only exception to that rule is where the person actually present (*e.g.*, the locksmith) affirmatively indicates they can act on behalf of the property owner. Martinez Depo. 148:10-15. Glinskas testified at his deposition that he and Paris assumed Engert was the owner's agent, and advised Engert that they were early, but if Engert wanted to, they could get started. DUMF #44. Glinskas claims that Engert agreed. DUMF #45. However, Roberts testified that he had never known Engert to not heed his suggestions, which included the instruction to wait for Roberts to arrive. Deposition of Roni Roberts ("Roberts Depo.") at 65:15-67:1. It is undisputed that Glinskas did not discuss with Engert any of the information communicated to the Civil Division as listed on the trip ticket/checklist. DUMF #46. Engert went back to his truck to obtain his tools. DUMF #47.

        The Deputies conducted their initial approach without Engert. DUMF #48. Glinskas noticed a camera in the front window that was angled toward the door. MUMF #52. The Deputies traveled at a

diagonal angle from the left side of the property, behind a large magnolia tree and walked toward the front door. DUMF #49. During his approach, Glinskas looked for anything out of the ordinary, including people or things that appeared hostile. DUMF #50. Other than the presence of security cameras, nothing appeared to be out of the ordinary to Glinskas. *Id.*

Paris used his ASP collapsible baton to loudly bang on the security door two to three times to make their presence known and to get the attention of the occupant. DUMF #54. Paris announced their presence, stating "Sheriff's Department." DUMF #55. At this time, Paris stood to the left of the pathway leading to the front door. MUMF #56. Glinskas stood at a vantage point where he could see both the left side of the house and the front door. DUMF #51. At some point, Engert approached the home and waited off to the side, away from the door to the side of the house away from the Deputies. DUMF #52. After a reasonable time passed with no answer, Paris told Engert to "go ahead," *i.e.*, that Engert could come up attempt to pick and/or drill the lock. DUMF #56.

Engert began to drill while kneeling in front of the door. DUMF #57; PUMF 136. After drilling the metal screen door for approximately 30 seconds, Engert stopped and stated that he thought he heard "something" or "someone" inside the house. DUMF #54. The Deputies directed Engert to go back into the position of safety to the side of the house. DUMF #59. Paris listened next to the security door and Glinskas listened through the window. DUMF #60. The Deputies listened for approximately half a minute. MUMF #66. Neither Deputy identified the noise or its originating source, or what type of noise Engert may have heard, nor did the Deputies identify any other noise. DUMF #61.[8]

The Deputies told Engert he could continue, and Engert began to drill again. DUMF #62; Glinskas Depo. at 178:16-23. Shortly thereafter, high-powered "NATO" rounds designed to pierce

_____

[8] ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████ .

sheetrock were fired through the front door. DUMF #63. Paris immediately was struck twice near the door. DUMF #64. Glinskas returned fire. DUMF #65. Engert stood up from the door and attempted to run away down the front path. DUMF #66. As he was running, Engert was struck by gunfire and fell down immediately. DUMF #67. Neither Engert nor Deputy Paris showed any signs of life. DUMF #68.[9]

The following additional "background facts" are presented by Defendants Paris and Glinskas and appear to be undisputed:

> Deputy Glinskas took a cover position and broadcasted an "11-99" officer down call over the radio frequency at 10:55 a.m. Two hundred plus federal and state law enforcement personnel responded to the call and participated in a six-hour standoff with the occupant. Ultimately, the occupant took his own life and set the entire structure at 2141 Chrysler Drive on fire. Following the completion of several investigations, it was determined that Ferrario had stashed over twenty firearms (mostly unregistered) including his SKS automatic weapon used to murder Deputy Paris and Engert, and that Ferrario had procured .762 "FMJ"—full metal jacket—ammunition to utilize during his ambush. Those rounds are designed to pierce walls, doors, sheetrock and bullet-resistant vests.

Doc. 102-1 at 8-9 (citations omitted).

### E.    Specific Facts Relevant to Supervision.

Martinez was employed by the Stanislaus County Sheriff's Department from 1998 until his retirement in 2013. From 2008 on, he was the supervisor of the Civil Division. Martinez's law enforcement career spans over 30 years. MUMF #1. Martinez was Paris's direct supervisor from 2010 until Paris's death. MUMF #2. Martinez became Glinskas's direct supervisor when he was transferred to the Civil Division approximately three weeks prior to the eviction at issue in this case. MUMF #3.

---

[9] Plaintiffs point to the deposition testimony of Ken Katsaris, Plaintiffs' police practices expert, who stated that, under the circumstances, neither Engert nor Paris should have been in front of the door "where you don't have any idea whether [the occupant] is there or not." PUMF #150. Defendants interpose numerous objections to the consideration of Mr. Katsaris's testimony. The Court finds it unnecessary to resolve these evidentiary disputes at this time, as the Court did not rely on Mr. Katsaris's testimony in evaluating the pending motions.



Veil trained other deputies, including Paris, that, among other things, a locksmith should be directed to kneel down low and off to the side as far as they could. Veil Depo. 46:3-14. Martinez confirmed that officers are "taught in the academy not to... stand in front of doors because you're...[in] the funnel of death." PUMF #80.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**F.**     **Prior Incidents of Violence During Evictions Conducted by the Civil Division.**

It is undisputed that in 2001, a shooting occurred during the course of an eviction assisted by former Civil Division Deputies Veil and Johnny Valdez. The Civil Division did not have any information about the tenants. DUMF #121; PUMF #6. Deputies Veil and Valdez went to the property to assist the owners with the eviction. *Id*. No locksmith was present and the owner did not have keys. The owner authorized the Deputies to gain entry to the front door forcibly. *Id*. The owner's son assisted the Deputies. *Id.* When the Deputies attempted to open the door, one of the occupants shot through the front door and hit the property owner's son in the arm. *Id.* The property owner's son was injured, but did not die. *Id.* Veil imparted this experience both to Martinez and to Paris. Martinez Depo. 55:7-16; PUMF #8.

In another prior eviction in 2011, where specific threats had been made by a known, quasi-vigilante group with a history of conflict with law enforcement and tax officials, and where specific, written threats had been placed on the lawn of the residence, Martinez called in additional law enforcement and the eviction ended safely. PUMF #11. Specifically, "two deputies with long rifles and [a Modesto Police Department] officer responded to assist" Veil, Martinez, Harper, and Harris. Martinez Depo. at 46. That eviction ended safely. PUMF #11. Martinez concedes that such an approach easily could have been followed in the eviction at issue in the present case. *Id*.

### III. <u>STANDARD OF DECISION</u>

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the

16

moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## IV. <u>DISCUSSION</u>

### A.   <u>Federal Civil Rights Claims.</u>

The SAC alleges that Paris, Glinskas, Martinez, and Harper are liable to Plaintiffs under Section 1983 for violating Plaintiffs' Fourteenth Amendment rights under the so-called "danger creation" exception by, among other things, "act[ing] with reckless or conscious disregard for, and deliberate indifference to, the creation or increased risk of danger to [] Engert." SAC ¶ 79. "Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux v. Abbey*, 263 F .3d 1070, 1074 (9th Cir. 2001). To state a claim under Section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under the color of state law.[13] *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

---

[13] Here, there is no dispute that all Defendants acted under color of state law.

49-50 (1999). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation and quotation marks omitted).

### 1.      <u>Qualified Immunity Standard.</u>

Defendants assert they are entitled to qualified immunity from Plaintiffs' claims. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citation and quotation marks omitted). "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. (citation and quotation marks omitted).

In determining whether an official is entitled to qualified immunity, courts employ a two-pronged inquiry. *Id*. First, a court must determine whether the official violated the plaintiff's constitutional right. *Id*. If a constitutional violation is present, a court must then determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Id*. (citation and quotation marks omitted); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). "For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Mattos*, 661 F.3d at 442  (quoting *Ashcroft v. al–Kidd*, ___U.S. ___, 131 S.Ct. 2074, 2083 (2011)). Courts are "permitted to exercise their sound discretion in deciding which of

the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).

### 2. Danger Creation Doctrine Generally.

The Fourteenth Amendment's Due Process Clause states: "…nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 2. This "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). Due process encompasses certain "fundamental" rights. *Reno v. Flores*, 507 U.S. 292, 301-302 (1993). This so-called "substantive due process" right "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (internal citations and quotations omitted). The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).

However, substantive due process typically "does not impose a duty on government officers to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007). In *DeShaney v. Winnebago County Department of Social Services*, the Supreme Court recognized that

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.

489 U.S. 189, 195 (1989). Since the Due Process Clause does not require the state to provide its citizens with a minimum level of security, it follows that the state cannot be held liable for failing to do so. *Id*. at 196-97. Accordingly, the general rule is that officials cannot be held liable under Section 1983 for an injury inflicted by a third party. *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) ("*Grubbs I*"). There are, however, "two exceptions [to this rule]: (1) the 'special relationship' exception; and (2) the 'danger

19

creation' exception." *Id*. Plaintiffs do not assert that the special relationship exception applies in this case, at least not in the context of their Fourteenth Amendment claims.[14] Plaintiffs do assert that the danger creation exception applies.

The danger creation exception is spelled out in detail in *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006). The plaintiff in *Kennedy* contacted police to report that a thirteen-year-old neighbor had molested her nine-year-old daughter. *Id*. at 1057. At the time of the report, the plaintiff, the mother of the nine-year-old, warned officers that the neighbor had violent tendencies. *Id*. The police assured the mother that she would be given notice prior to any police contact with the neighbor's family about the allegations. *Id*. at 1058. However, breaking this promise, the police questioned the neighbor about the allegations before officers warned plaintiff. *Id*. Later that night, and before plaintiff was warned by police, the neighbor broke into plaintiff's home, shot plaintiff, and fatally shot plaintiff's husband. *Id*.

Plaintiff alleged that the involved officer violated her Fourteenth Amendment right to substantive due process by placing her in a known danger with deliberate indifference to her personal physical safety. The Ninth Circuit reviewed the applicable standards and existing precedent, summarizing it as follows:

> It is well established that the Constitution protects a citizen's liberty interest in her own bodily security. *See, e.g., Ingraham v. Wright*, 430 U.S. 651 (1977); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989). It is also well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action "affirmatively place[s] the plaintiff in a position of danger," that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced. *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989); *Wood*, 879 F.2d at 589–90.

---

[14] Plaintiffs do argue that a "special relationship" exception applies to their state law negligence claims, but no party suggests the standard applicable to the "special relationship" exception in California negligence jurisprudence is analogous to the special relationship exception under the Fourteenth Amendment danger creation exception.

This circuit first recognized such "danger creation" liability in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In *Wood*, a state trooper determined that the driver of an automobile was intoxicated, arrested the driver and impounded the car. The officer's actions allegedly left Wood, a female passenger, stranded late at night in a known high-crime area. Subsequently, Wood accepted a ride from a passing car and was raped. This court held that Wood could claim § 1983 liability, since a jury presented with the above facts could find "that [the trooper] acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment." *Id*. at 588.

Since *Wood*, this circuit has held state officials liable, in a variety of circumstances, for their roles in creating or exposing individuals to danger they otherwise would not have faced. *See L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) [] (holding state employees could be liable for the rape of a registered nurse assigned to work alone in the medical clinic of a medium-security custodial institution with a known, violent sex-offender); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (holding as viable a state-created danger claim against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him inside his house); *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000) (holding police officers could be held liable for the hypothermia death of a visibly drunk patron after ejecting him from a bar on a bitterly cold night). These cases clearly establish that state actors may be held liable "where they affirmatively place an individual in danger," *Munger*, 227 F.3d at 1086, by acting with "deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it," *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) [].

*Kennedy*, 439 F.3d at 1061-62 (footnotes omitted). *Kennedy* delineated a two-part test to determine whether the danger creation doctrine applies, requiring: (1) official (state) action that affirmatively placed an individual in danger; and (2) deliberate indifference to that danger.[15] *Id*. at 1062-64.

---

[15] The County and Defendant Harper cite *County of Sacramento v. Lewis*, 523 U.S. 833 846-48, 852-53 (1998), for the proposition that a substantive due process claim must be supported by evidence of actions that "shock the conscience" -- conduct that is defined as being "malicious" and "sadistic" and undertaken "for the very purpose of causing harm." *See* Doc. 131 at 10-11. *Lewis* draws a distinction between circumstances in which "deliberation is practical" from those in which the government actor must make split-second decisions about an evolving situation. Where deliberation is practical, a "deliberate indifference" standard applies. *Id*. at 853. However, where split-second decisions are at issue, for example those made by officers involved in a high speed police chase, "intent to harm ... physically or worsen [an individual's] legal plight" must be present. *Id*. at 854. Here, however, the record, viewed in the light most favorable to Plaintiffs, suggests deliberation was possible in connection with the events surrounding the eviction at issue in this case. The bulk of the information about the risk present was in the hands of Defendants well before the eviction began. Even limiting the examination only to Paris's and Glinskas's conduct after Engert indicated that he might have heard something inside the house, there was still time for Paris and Glinskas to deliberate prior to inviting Engert to the door again. Therefore, the Court declines to apply the "intent to harm" standard articulated in *Lewis*.

This two-part test will be applied as to each set of Defendants to determine whether Plaintiffs have met their burden on summary judgment to establish the existence of a constitutional violation. Where a constitutional violation is established for purposes of summary judgment, the Court will proceed to the second inquiry in the qualified immunity analysis: whether the contours of the right alleged to have been violated were sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

### 3. **Paris and Glinskas.**

#### a. **Affirmative Conduct.**

 "In examining whether an officer affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [should it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court must] examine whether the officer left the person in a situation that was more dangerous than the one in which they found him." *Id*. at 1062 (internal citations and quotations omitted); *see also Jamison v. Storm*, 426 F. Supp. 2d 1144, 1155 (W.D. Wash. 2006) (requiring more than an "omission or failure to act" to satisfy the first element). Evaluating the officer's motion for summary judgment, the Ninth Circuit in *Kennedy* found that by informing the neighbor of the allegations without first warning plaintiff, the officer involved "affirmatively created an actual, particularized danger [plaintiff] would not otherwise have faced." *Kennedy*, 439 F.3d at 1063.

 Other examples further illustrate this principle. In *Munger*, the Ninth Circuit permitted a claim to survive summary judgment where the evidence, viewed in the light most favorable to the plaintiffs, demonstrated that police officers ejected Munger from a bar late at night when the outside temperatures were below freezing, knowing that he was wearing only a t-shirt and jeans, was intoxicated, was prevented by the officers from driving his truck or re-entering the bar, and was walking away from nearby open establishments. 227 F.3d at 1087. Munger died of hypothermia. *Id*. at 1086. Under those

circumstances, the Ninth Circuit concluded the officers left Munger "in a situation that was more dangerous than the one in which they found him." *Id*. at 1086.

In *Penilla*, when a man became seriously ill on the porch of his home, his neighbors called 911 and requested emergency medical assistance. 115 F.3d at 708. When police officers arrived, they examined Penilla and found him to be in grave need of medical attention, but moved him inside his home, locked the door, and cancelled the call for paramedics. *Id*. Penilla subsequently died. *Id*. The Ninth Circuit affirmed the denial of a motion to dismiss on qualified immunity grounds, finding that the officers "allegedly took affirmative actions that significantly increased the risk facing Penilla." *Id*. at 710.

In contrast, in *Campbell v. State Department of Social and Health Services*, 671 F.3d 837 (9th Cir. 2011), a developmentally disabled adult with a known seizure disorder, Justine, died after nearly drowning in the bathtub at her group home. The Ninth Circuit found that, while her caregivers were responsible for coordinating her care and monitoring her regularly, "none of them acted affirmatively to place [her] in the way of a danger they had created." *Id*. at 847. Rather, "a long bath was one of [her] favorite activities--one she frequently enjoyed." *Id*. Her "death was caused by the dangers inherent in her own physical and mental limitations." *Id*.

> [The majority of the panel] respectfully disagree[d] with the dissent that Defendants may be liable for a constitutional violation "[b]y ordering Justine to take a bath without direct supervision" or that "the 'routine' of having Justine bathe herself without any necessary precautions was of the state's making." [671 F.3d] at 848. The only facts in the record show that Mitchell had checked on Justine in the tub several times and that, on finding her not breathing, called for help, pulled her from the tub, and dialed 911. Those facts might show a "lapse in judgment" but not a finding of "deliberate indifference," or an intent "to expose [Justine] to such risks without regard to the consequences."

*Id*. (citations omitted).

Similarly, in *Johnson v. City of Seattle*, 474 F.3d 634, 636-41 (9th Cir. 2007), the Ninth Circuit upheld summary judgment for the City of Seattle on a danger creation claim brought by the plaintiffs

who were assaulted by members of a crowd at a Mardi Gras celebration. Although Seattle did not have a history of violent Mardi Gras celebrations, escalating public violence in the weeks leading up to the celebration prompted the police department to develop an aggressive plan to keep the peace. *Id.* at 636. In response to two quiet, peaceful nights preceding the celebration, the police department scaled back its officer presence. *Id*. at 637. Nonetheless, violence broke out in Seattle's Pioneer Square and expanded to such an extent that the police officers were ordered to "evacuate" and to remain at the perimeter of the crowd. *Id*. Eventually officers cleared the crowd with chemical agents, but the violence left one person dead and dozens injured, including the plaintiffs. *Id*. The plaintiffs alleged the police department could be liable under the danger creation doctrine for abandoning its aggressive plan for crowd control and implementing a passive plan to remain at the perimeter of the crowd. *Id*. at 636. After reviewing Ninth Circuit decisions on the danger-creation exception and the Supreme Court's decision in *DeShaney*, the Ninth Circuit held:

> In contrast to the plaintiffs in *Wood*, *Penilla*, *Munger*, *Grubbs* and *Kennedy*, the Pioneer Square Plaintiffs have failed to offer evidence that the Defendants engaged in affirmative conduct that enhanced the dangers the Pioneer Square Plaintiffs exposed themselves to by participating in the Mardi Gras celebration. The decision to switch from a more aggressive operation plan to a more passive one was not affirmative conduct that placed the Pioneer Square Plaintiffs in danger, because it did not place them in any worse position than they would have been in had the police not come up with any operational plan whatsoever.
>
> ***
>
> Even if proved not the most effective means to combat the violent conduct of private parties, the more passive operational plan that the police ultimately implemented did not violate substantive due process because it "placed [the Pioneer Square Plaintiffs] in no worse position than that in which [they] would have been had [the Defendants] not acted at all."

*Id*. at 641 (quoting *Deshaney*, 489 U.S. at 201).

*Grubbs I*, 974 F.2d 119, also is instructive. In that case, a registered nurse employed by a state-run, medium-security custodial institution for male offenders was raped and terrorized by an inmate. *Id*.

24

at 120. The Ninth Circuit found that Defendants "created the danger" to which the nurse fell victim by assigning her attacker to work with her that day. *Id*. at 121. Defendants knew the attacker "had an extraordinary history of unrepentant violence against women and girls; was likely to assault a female if left alone with her;... would be alone with [the nurse] during her rounds." *Id.* The Ninth Circuit also noted that the defendants knew that the plaintiff would be alone with the dangerous coworker, would "not be prepared to defend against or take steps to avert an attack because she had not been informed at hiring that she would be left alone with violent offenders," *id*., and in fact had been led to believe she would not be required to work alone with violent sex offenders. *Id*. at 120. Although the decision in *Grubbs I* does not articulate clearly the nature of the "affirmative act" in that case, the Ninth Circuit appears to have relied on both the assignment of the attacker to work with his victim and the related misrepresentation of the risks inherent to her job as affirmative acts.[16]

Here, the record plausibly supports a finding that Paris and Glinskas engaged in affirmative conduct that was more than a mere omission or failure to act, and that their conduct left Engert "in a situation that was more dangerous than the one in which they found him." The undisputed facts indicate that on two occasions Engert was in a position of relative safety away from the door of the house, waiting for the Deputies to signal him to approach and begin his work. A reasonable jury could find that Paris and Glinskas signaling to Engert to approach, both the first and second times, were affirmative acts that brought Engert into a situation that was more dangerous than the position of relative safety. Although Engert was aware of at least some of the background threat information given to the Civil

---

[16] This interpretation is supported by *Davis v. Oregon*, No. 3-12-cv-635-SI, 2014 WL 2574489, at *2 (D. Or. June 9, 2014), which concerned a caregiver who worked at a state-run home for persons who suffer from mental health conditions that cause them to act out in violent and aggressive ways such that they are considered dangerous to themselves and others on a daily basis. The plaintiff was assigned to work with a resident who eventually brutally attacked her. *Id*. After recovering from the attack and returning to work, Davis was later assigned to work with that resident again. *Id*. The district court found that summary judgment was appropriate as to the period of time before the initial attack because: (1) Davis's job was inherently dangerous and she consented to and had full knowledge of the staffing procedures at the home; and (2) there was nothing that would have indicated to the defendants that the risk to Davis was anything beyond the "ordinary, understood, or disclosed risks." *Id*. at *6. However, summary judgment was inappropriate as to the decision to re-assign Davis to work with her attacker again because a reasonable trier of fact could find that the re-assignment placed Davis at a heightened risk because, among other things, there was evidence to suggest that the attacker was targeting Davis specifically. *Id*. at *7.

Division, a reasonable jury also could find that Paris's and Glinskas's conduct suggested to Engert that they had made a potentially dangerous scene safe. This is sufficient for purposes of summary judgment to establish the first element of a danger creation claim.

### b.   **Deliberate Indifference.**

As to the second prong of the test articulated in *Kennedy*, a court "must decide the related issues of whether the danger to which" the defendant exposed plaintiff "was known or obvious, and whether [defendant] acted with deliberate indifference to it." 439 F.3d at 1064. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). To establish the state officials acted with deliberate indifference to a danger they allegedly created, a plaintiff must show "(1) an unusually serious risk of harm, ... (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) ("*Grubbs II*").

### (1)   **Unusually Serious Risk of Harm/Defendants' Knowledge Thereof.**

The first two steps of the deliberate indifference analysis—whether there is an unusually serious risk of harm and whether Defendants had knowledge of that risk—can be evaluated together in this case by focusing only on the information that was recorded on the eviction questionnaire, as it is undisputed Paris and Glinskas both read and considered that information.

Defendants make much of the fact that there was no specific threat (*e.g.*, a specific verbal or written threat by the occupant to act violently toward the eviction personnel). However, there need not be a specific threat to the plaintiff. In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), for example, police arrested an intoxicated driver and impounded his automobile, leaving a female passenger on the side of the road five miles away from her home on a cold night in a high-crime area without a jacket or money. The passenger accepted a ride from a stranger who drove her to a secluded area and raped her.

*Id.* at 586. The Ninth Circuit held that because the defendant officer knew the area had a high crime rate and, "as a matter of common sense," understood the risks faced by the plaintiff, a jury could reasonably find the officer acted with deliberate indifference. *Id.* at 590.

It is undisputed that Paris and Glinskas were aware of the warnings presented on the eviction questionnaire, namely that: (1) the occupant being evicted from the Property was ex-military; (2) there was a camera-video surveillance system at the Property; (3) the occupant had weapons, including M16-type guns; (4) there was an extra strength security door on the front of the residence; (5) that the occupant was "possibly" violent; and (6) was a "weird weirdo." DUMF ## 9-10. A reasonable juror could find that, "as a matter of common sense," this presented an unusually serious risk of harm, especially in light of record evidence suggesting that numerous employees within the Civil Division, including Juarez and Martinez, found the information alarming enough to warrant special steps be taken to flag the information.

### (2)    Failure to Take Obvious Steps to Address the Risk.

The final factor to be considered is whether Defendants failed to take obvious steps to address the risks. The undisputed evidence indicates that Paris and Glinskas did take <u>some</u> obvious steps to address the risks at the Property. They approached the house without Engert and looked for signs of the occupant. Only after this did Paris and Glinskas invite Engert to approach the house. Moreover, when Engert said he heard a noise, they directed him to a position of safety and did not allow him to resume until they had checked for danger.

However, a reasonable jury could find that Paris and Glinskas failed to take <u>additional</u>, obvious steps to address the risk. For example, in another eviction in 2011, where specific threats had been made by a known, quasi-vigilante group with a history of conflict with law enforcement and tax officials, and where specific, written threats had been placed on the lawn of the residence, Martinez called in additional law enforcement and the eviction ended safely. MUMF #11. Martinez concedes that such an

approach easily could have been followed in the eviction at issue in the present case. *Id*. A reasonable jury could find that this was an obvious step that could have been taken to address the risks presented by this eviction.[17]

### (3)    **Proximate Cause.**

Relatedly, in danger creation exception cases, the Ninth Circuit has required the injury caused to Plaintiff be a foreseeable consequence of the risk. For Example, in *Lawrence v. United States*, 340 F.3d 952 (9th Cir. 2003), the Ninth Circuit refused to impose danger creation liability upon two officers who approved the request of a convicted drug trafficker to work as a counselor at a group home for juveniles. The felon later sexually abused a youth at the group home. *Id*. at 954. Because the felon's criminal history consisted of a drug trafficking conviction and no crimes of violence or sexual abuse, while it might have been foreseeable that the felon would distribute illegal drugs to the residents of the group home, it was not foreseeable that he would sexually abuse them. *Id*. at 957. Therefore, the Ninth Circuit concluded that plaintiff failed to show the defendant officer's conduct was the proximate cause of her injuries. *Id*.

*Kennedy* clarified the standard, stating in a footnote that the Ninth Circuit has "never required that, for a danger to exist, the exact injury inflicted by a third party must have been foreseeable. Instead, the state actor is liable for creating the foreseeable danger of injury given the particular circumstances." 439 F.3d at 1064 n. 5. The Ninth Circuit cited *Wood* as an example:

> In *Wood*, we did not speculate, nor require, that [the defendant officer] foreseeably knew Wood would in fact be raped by a passing motorist. We held he could be liable, however, for leaving Wood in a situation more dangerous than the one she already faced, i.e., for stranding her alone in a known high-crime area at 2:30 a.m. *See Wood*, 879 F.2d at 590.

*Id*.

[17] ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

Here, if the evidence is viewed in the light most favorable to Plaintiffs, Engert's death was the foreseeable consequence of the risks known to Paris and Glinskas at the time of the eviction. They had information to suggest there might be an armed, possibly violent "weirdo" at the Property. A jury need not find that Paris and/or Glinskas knew Ferrario would in fact shoot Engert, just that Engert's death was a foreseeable consequence of exposing him to the risks identified in the trip ticket.

In sum, Plaintiffs have presented evidence that could support a jury verdict in their favor on a danger creation claim against Paris and Glinskas.

### 4. Was the Right Clearly Established?

Having found that the record could support a finding that Paris and Glinskas committed a constitutional violation, the Court proceeds to the second step of the qualified immunity analysis. "For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Mattos*, 661 F.3d at 442 (quoting *al–Kidd*, ___ U.S. ___, 131 S.Ct. at 2083).

"[W]hether the law was clearly established must be undertaken in light of the specific context of the case[.]" *Estate of Ford v. Ramirez–Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (citation and internal marks omitted). In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional). "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *C.B. v. City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing *al–Kidd*, 131 S.Ct. at 2083). An

official's subjective beliefs are irrelevant. *Inouye*, 504 F.3d at 712. However, "closely analogous preexisting case law is not required to show that a right was clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) (internal citations and quotations omitted). While "there must be some parallel or comparable factual pattern[,] ... the facts of already decided cases do not have to match precisely the facts with which [the government employer] is confronted." *Id.*

The Court finds the Ninth Circuit's qualified immunity analysis in *Kennedy* informative, although not precisely analogous. The Ninth Circuit articulated the general state of the law as of 1998, the year of the incident at issue in *Kennedy*:

> It is beyond dispute that in September 1998, it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced. This court first recognized the theory of state-created danger liability almost ten years before the events in this case in *Wood*. In the interim, we published three decisions explicitly recognizing such liability under three distinct factual scenarios. *See Grubbs*, 974 F.2d 119; *Koon*, 34 F.3d 1416; *Penilla*, 115 F.3d 707. Indeed, almost three years before the actions at issue in this case, we concluded "the law was clearly established that officers may be liable where they affirmatively place an individual in danger." *See Munger*, 227 F.3d at 1086.8 We have explained before that the responsibility for keeping abreast of constitutional developments rests "squarely on the shoulders of law enforcement officials. Given the power of such officials over our liberty, and sometimes over our lives, this placement of responsibility is entirely proper." *Wood*, 879 F.2d at 595 (quoting *Ward v. County of San Diego*, 791 F.2d 1329, 1332 (9th Cir. 1986)).

439 F.3d at 1065.[18] In light of these general principles, the Ninth Circuit concluded "that no reasonable officer in Shields's position, knowing what he knew, could have concluded that Kennedy had no right not to be placed in physical danger by his deliberately indifferent action." *Id*. Responding to the dissent's call for a "finer resolution" of analysis, the Ninth Circuit first implicitly rejected the idea that any finer resolution was required. *Id.* Then, assuming *arguendo* that finder resolution was needed, the

---

[18] Defendants argue that the Ninth Circuit's jurisprudence on the danger creation exception is in contravention of that of the Supreme Court and other Circuits. Doc. 131 at 18. This is an argument that must be directed to the Court of Appeals or a higher court. This Court is bound to apply Ninth Circuit precedent.

Ninth Circuit concluded that the facts in Kennedy were not "meaningfully distinguishable" from those articulated in *Grubbs I*.

> In *Grubbs*, a registered nurse working at a medium security custodial institution brought a § 1983 claim against her supervisors after she was allegedly raped and terrorized by a young male inmate. According to the plaintiff, her employer had told her she would not be working alone with violent sex offenders. Notwithstanding that representation, her employer subsequently allowed an inmate prone to violence against women to work with her unsupervised. The plaintiff, relying upon that representation, did not take all the precautions she might otherwise have taken, and was subsequently assaulted.
>
> In *Grubbs*, as in this case, a state official affirmatively acted: supervisor Grubbs assigned a violent sex offender to work closely with L.W., and Officer Shields notified Burns, leaving Kennedy unable to protect her family. In *Grubbs*, as in this case, those state actions left plaintiffs exposed to the danger of the subsequent physical assault and injury they in fact suffered. And in both cases the plaintiff relied upon the state actor's representation and did not take protective measures she otherwise would have taken, and the state's action made plaintiffs vulnerable to a particularized danger they would not have faced but for that action.
>
> Indeed, in this case, as in *Grubbs*, Shields used his "authority as a state ... officer to create an opportunity for [Burns] to assault [Kennedy] that would not have otherwise existed." *Grubbs*, 974 F.2d at 121. Moreover, Kennedy, like *L.W.,* "is not seeking to hold Defendant[ ] liable for [Burns's] violent proclivities. Rather, [she] seeks to make Defendant[ ] answer for [his] acts that independently created the opportunity for and facilitated [Burns's] assault on her." *Id*. at 122. At bottom Kennedy's claim is exactly like *L.W.*'s, i.e., that a state actor "enhanced [her] vulnerability to attack by misrepresenting to her the risks" she faced. *Id*. at 121. No reasonable officer in Shields's position, knowing what he allegedly knew and what he must be charged with knowing, could have concluded otherwise than that Kennedy had a right not to be placed in obvious physical danger as a result of his deliberately indifferent action.

*Kennedy*, 439 F.3d at 1065-67.

The question is whether the present case and earlier cases are sufficiently similar that Paris and Glinskas would have had fair warning that their actions were unlawful. *See Decoria v. County of Jefferson*, 333 Fed. App'x 171, 173 (9th Cir. 2009). Here, the evidence, viewed in a light most favorable to Plaintiffs, reveals two officers who affirmatively cleared an unarmed civilian to participate in an

eviction, despite the existence of information suggesting, among other things, that the occupant might be violent and might possess high-powered weapons. The Court finds that, taken together, *Woods* and *Grubbs I* put Defendants on notice that their conduct was potentially unlawful. These cases stand for the proposition that officials may not take affirmative actions to place a civilian into a dangerous situation where common sense indicates a high risk of serious harm. Here, if Plaintiffs' facts are accepted, Defendants did just that by inviting Engert to begin drilling the front door. Viewing the facts in a light most favorable to Plaintiffs, this case cannot meaningfully be distinguished from *Woods* and *Grubbs I*.

Contrary to Defendants' assertions, this case does not present a mere "qualm" with law enforcement strategy akin to that addressed in *Johnson*. There, the Ninth Circuit found the danger creation exception could not apply because there was no evidence of an affirmative act. The adoption of a "more passive operational plan ... did not violate substantive due process because it placed [the plaintiffs] in no worse position than that in which they would have been had the Defendants not acted at all." 474 F.3d 641. Here, as discussed above, at least one additional affirmative act took place—inviting Engert to the door of the Property. Existing Ninth Circuit precedent put Paris and Glinskas on notice that this conduct could trigger Fourteenth Amendment liability.

Paris's and Glinskas's motion for summary judgment that they are entitled to qualified immunity as to Plaintiffs' Fourteenth Amendment claim therefore is DENIED. This denial is without prejudice to appropriate post-trial motions, depending on factual findings by the jury.

### 5. **Martinez.**

Plaintiffs allege Martinez is liable for his conduct as a supervisor. Plaintiffs also allege Martinez is liable directly under the danger creation doctrine for his own conduct.

### a. **Supervisory Liability Generally.**

It is well-established that supervisory personnel "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662,

676 (2009) (italics in original). Rather, a plaintiff must establish that each individual supervisory government official defendant, "through the official's own individual actions, has violated the Constitution." *Id.* Thus, supervisory liability can be imposed only if (1) the supervisor was personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

"The requisite causal connection can be established ... by setting in motion a series of acts by others," or by "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* More specifically, the Ninth Circuit has recognized that supervisory liability may be imposed: (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a reckless or callous indifference to the rights of others. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991). Because supervisory liability is personal liability, an official against whom a claim of supervisory liability is advanced may assert the affirmative defense of qualified immunity. *al-Kidd v. Ashcroft*, 580 F.3d 949, 963-65 (9th Cir. 2009), *rev'd on other grounds al-Kidd*, 131 S. Ct. 2074.

//

//

33

**(1)** <u>**Supervision and Control.**</u>



**(2)** <u>**Acquiescence.**</u>

"[W]here the applicable constitutional standard is deliberate indifference, a plaintiff may state a claim for supervisory liability based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by others." *Hydrick v. Hunter*, 669 F.3d 937, 941 (9th Cir. 2012) (internal citation and quotations omitted). Plaintiffs assert that Martinez is potentially liable for acquiescing in the conduct of his subordinates.

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████

However, the record does plausibly support a more narrow acquiescence claim. It is undisputed that Martinez was aware of the information on the trip ticket. He conceded that the confluence of warnings documented there was unusual, stating that he might see such a combination of factors "perhaps once a year." Nevertheless, Martinez acquiesced in permitting the eviction to proceed under normal protocol, as opposed to requiring a more tactical approach, despite his knowledge that a civilian locksmith was likely to be present. *See* Martinez Depo. at 33:14-16. A reasonable finder of fact could conclude that Martinez acquiesced in the protocol used to effectuate the eviction at the Property. If the finder of fact determines that the protocol utilized supports liability against Paris and Glinskas, Martinez's equal knowledge of the underlying circumstances leading up to the approach to the residence exposes him to potential liability as well. The Court does not believe that the qualified immunity analysis would differ in any material way from that applicable to the analysis of Paris's and Glinskas's direct liability, even though Martinez's liability would be premised on his supervisory role.

Martinez's motion for summary judgment is DENIED as to this narrow form of acquiescence liability.

**(3)    Reckless or Callous Indifference.**

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

The Ninth Circuit recently addressed the meaning of "reckless or callous indifference" and equated it to "deliberate indifference."

> The precise distinction between "deliberate indifference" and "reckless or callous indifference" remains an open question. As discussed above, "deliberate indifference" is defined in this circuit as "the conscious choice to disregard the consequences of one's acts or omissions." *See* 9th Cir. Civ. Jury Instr. 9.7 (2007). Furthermore, when the Supreme Court articulated the deliberate-indifference standard for failure-to-protect claims in Farmer, it defined the standard as one of criminal recklessness. *See Farmer*, 511 U.S. at 837–39. The circular nature of these definitions gives rise to the inference that the terms are synonymous.

*Castro v. Cnty. of Los Angeles*, ___ F.3d ___, 2015 WL 1948146, at *9 (9th Cir. May 1, 2015). On the present record, because there is sufficient evidence to support a finding of deliberate indifference as to the Fourteenth Amendment claims against Paris and Glinskas, Martinez is not entitled to summary judgment on the theory that he acted with reckless or callous disregard for Engert's safety.

Martinez's motion for summary judgment is DENIED as to a "reckless or callous indifference" theory of liability premised upon the asserted failure to require a more tactical response to the eviction.

**b.    Martinez's Direct Liability.**

Plaintiffs also assert that Martinez is liable under a direct liability theory. As mentioned above, to establish Martinez's direct liability, Plaintiffs must prove: (1) official (state) action that affirmatively placed an individual in danger; and (2) deliberate indifference to that danger. *Kennedy*, 439 F.3d at 1055.

Plaintiffs' direct liability claims against Martinez fail because Plaintiffs cannot establish affirmative conduct. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

The only other "acts" Plaintiffs mention in connection with Martinez are actually omissions. For example, Plaintiffs complain that Martinez "t[ook] virtually no precautions to mitigate the risk."[20] Satisfaction of the "affirmative act" element of a danger creation claim requires more than an "omission or failure to act." *See Jamison*, 426 F. Supp. 2d at 1155.

Martinez is entitled to summary judgment as to any direct liability claim against him.

### 6.      Harper.

Plaintiffs assert Harper is liable under various theories of supervisory liability. As was the case with Martinez, Plaintiffs concede that they do not assert a failure to train claim against Harper. ████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

### B.      State Law Negligence/Wrongful Death Claim.

### 1.      Allegations in the SAC.

Plaintiffs' seventh cause of action for "Negligence/Wrongful Death"[21] is brought under California Code of Civil Procedure §§ 377.60 and 377.61. SAC at ¶ 109. Plaintiffs allege that "[p]rior to

---

[20] Martinez did engage in certain affirmative acts in connection with preparation for the eviction at the Property, including instructing Juarez to highlight the threat-based information on the trip ticket. However, as all parties appear to concede, this precautionary act, although perhaps an insufficient one, did not endanger Engert. *See* Doc. 182 at 23.

[21] The Court will refer to the claim as "Plaintiffs' negligence claim."

April 12, 2012, Defendants knew or should have known that [] Ferrario was armed, dangerous, mentally disturbed, and posed a real and present threat to anyone who approached his residence, especially law enforcement personnel and anyone else involved in attempted to evict [him]." *Id.* at ¶ 110. Plaintiffs contend that "Defendants created a special relationship with [] Engert through a promise, either express or implied through conduct, that it would be safe for him to be at the Ferrario residence." *Id.* "The deputies made this express or implied promise both before and after hearing sounds from within the [Property], including that they would protect him from any danger," and Engert "relied on these ... promises to his detriment." *Id.* at ¶ 111. Plaintiffs assert that Defendants owed Engert "a duty to act with due care to avoid unnecessary or unjustified harm," and they breached that duty. *Id.* at ¶ 112.

Specifically, Plaintiffs allege that "Paris and Glinskas recklessly, carelessly and negligently approached the [Property] with [] Engert, thereby placing Engert directly in harm's way and in the line of fire." *Id.* at ¶ 113. Finally, Plaintiffs assert that the supervisory Defendants owed Engert "a duty to hire, train, and supervise its employees so as not to cause harm to Decedent, and to prevent the violation of his legal rights," and they "breached this duty through the hiring, failure to train, and failure to supervise Sheriff's personnel responsible for causing or increasing the risk of harm to [Engert]." *Id.* at ¶ 115.

In sum, Plaintiffs argue that Ferrario's shooting and killing Engert "were foreseeable and were the legal and proximate result of Defendants' negligence in failing to exercise reasonable care to prevent injuries and death to non-law enforcement personnel working alongside and at the direction of Sheriff's deputies and the [P]roperty owner," *id.* at ¶ 116, and that, as a result of Defendants' alleged negligence, Plaintiffs have suffered various damages resulting from Engert's death. *Id.* at ¶ 117.[22]

---

[22] The SAC also includes RT Financial and Roberts as defendants in this Negligence/Wrongful Death claim. *Id.* at ¶ 114. Roberts and Plaintiffs have entered into a settlement agreement. *See* Doc. 200. The status of the claims against RT Financial remains unclear. RT Financial has not moved for summary judgment.

2.  **Plaintiffs Fail to Oppose Motion for Summary Judgment as to the State Law Claims Against Harper.**

Harper moved for summary judgment as to all of the state law claims against him. Doc. 131 at 22-23. Plaintiffs failed to oppose that motion. *See* Doc. 196 at 9. Harper notes that Plaintiffs' negligence claim against him "is not premised on [his] personal involvement in the actual incident, but rather only vaguely alleges that [he] was involved in employment and training decisions." Doc. 131 at 32 (citing SAC at ¶ 115). Under California Government Code 820.8 ("§ 820.8"), "a public employee may not be held individually liable based on a *respondeat superior* theory of liability; supervisors may, however, be held liable for injuries caused by their own acts or omissions." *Bass v. City of Fremont*, No. C12-4943 THE, 2013 WL 891090, at *8 (N.D. Cal. Mar. 8, 2013); *Doe v. Beard*, ___ F. Supp. 3d ___, 2014 WL 6473423, at *9 n.8 (C.D. Cal. Nov. 18, 2014) (§ 820.8 "does not exonerate a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission"). California public entities and their employees are immune from negligence claims under California Government Code § 815(a), "unless there is a statutory basis for the negligence claim." *Manning v. City of Rohnert Park*, No. C 06-3435 SBA, 2006 WL 3591149, at *8 (N.D. Cal. Dec. 11, 2006) (citing *Eastburn v. Regional Fire Protection Auth.*, 31 Cal.4th 1175, 1179-80 (2003)). This holding applies to "a common law tort claim of negligence against a city and police chief by a plaintiff attempting to hold the police chief, not directly involved in the incident in that case, liable for the negligent 'selection, training, retention, supervision, and discipline of police officers.'" *Id.* (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1111-12 (2003)); *see also Sanders v. City of Fresno*, No. 05-469-AWI-SMS, 2006 WL 1883394, at *8 (E.D. Cal. July 7, 2006) ("The *Munoz* Court disallowed theories of 'negligent supervision, hiring, etc.' as against Union City and [Police] Chief [] since such theories are not set forth in any requisite statutes, as required by *Eastburn*."). Plaintiffs have not provided—and the Court cannot find—any statutory basis for finding Harper liable under California law for their negligence claim. Accordingly, Harper's motion for summary judgment on Plaintiff's negligence claim is GRANTED.

Likewise, the County is immune from liability for any state claims predicated upon Harper's action. *See* Cal. Gov. Code § 815.2 ("a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability"); *Kemmerer v. Cnty. of Fresno*, 200 Cal. App. 3d 1426, 1435 (1988) ("Though [California Government Code] sections 821.6 and 820.2 expressly immunize only the employee, if the employee is immune, so too is the County.").

### 3.  Immunity Under Cal. Gov. § 820.2.

All remaining Defendants argue they are immune from liability for negligence/wrongful death pursuant to California Government Code § 820.2 ("§ 820.2"), which provides in relevant part: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him." "'Immunity is reserved for those '*basic policy decisions* [which have] . . . been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.'" *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1051 (2007) (quoting *Johnson*, 69 Cal.2d at 793) (emphasis in original).

"[N]ot all acts requiring a public employee to choose among alternatives entail the use of 'discretion' within the meaning of section 820.2." *Barner v. Leeds*, 24 Cal 4th 676, 684-85 (2000). "[C]ourts must distinguish between public employees' policy decisions and their operational, or ministerial, decisions." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 639 (9th Cir. 2012). "An act or omission is considered discretionary (and subject to immunity) where it involves planning and policymaking." *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 341 (2014) (internal citation and quotation omitted). Decisions entitled to immunity under § 820.6 therefore require "comparisons, choices, judgments, and evaluations, [which] comprise[] the very essence of the exercise of 'discretion.'" *Thompson v. Cnty. of Alameda*, 27 Cal.3d 741, 749 (1980).

"On the other hand, there is no basis for immunizing lower level decisions that merely implement a basic policy already formulated." *Barner*, 24 Cal.4th at 685. Accordingly, "[t]here is no immunity 'if the injury . . . results, not from the employee's exercise of discretion vested in him to undertake the act, but from his negligence in performing it after having made the discretionary decision to do so." *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998) (quoting *McCorkle v. City of Los Angeles*, 70 Cal.2d 252, 261 (1969)).

Courts have found the following to constitute discretionary decisions for which police officers are immune under § 820.2:

> (1) the decision to pursue a fleeing vehicle (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 519 & fn. 13 [noting that, while long line of Court of Appeal decisions have held that negligence liability may not be based on officer's decision to engage in vehicle pursuit, the California Supreme Court has never ruled on question]; *Bratt v. City and County of San Francisco* (1975) 50 Cal. App. 3d 550, 553); (2) the decision to investigate or not investigate a vehicle accident (*McCarthy v. Frost* (1973) 33 Cal.App.3d 872, 875; (3) the failure to make an arrest or to take some protective action less drastic than arrest (*Michenfelder v. City of Torrance* (1972) 28 Cal. App. 3d 202, 206); (4) the decision whether to use official authority to resolve a dispute (*Watts v. County of Sacramento* (1982) 136 Cal. App. 3d 232, 234-235); and (5) the decision whether to remove a stranded vehicle (*Posey v. State of California* (1986) 180 Cal. App. 3d 836, 850; *Bonds v. State of California ex. rel. Cal. Highway Patrol* (1982) 138 Cal. App. 3d 314, 321-322).

*Conway v. Cnty. of Tuolumne*, 231 Cal. App. 4th 1005, 1015 (2014) (parallel citations omitted).

However, officers "are not immune under section 820.2 when their acts are ministerial or public policy dictates against immunity." *Id.* Courts have determined discretionary immunity does not apply to:

> (1) an officer's conduct of an accident investigation after the officer made the discretionary decision to undertake the investigation (*Green v. City of Livermore* (1981) 117 Cal.App.3d 82, 87–89) . . . (2) arresting the wrong person while executing a warrant (*Bell v. State of California* (1998) 63 Cal. App. 4th 919, 929; (3) deciding to arrest an individual when there was no probable cause to do so (*Gillan v. City of San Marino* (2007) 147 Cal. App. 4th 1033, 1047, 1051; and (4) using unreasonable force when making an arrest or overcoming resistance to it (*Scruggs v. Haynes* (1967) 252 Cal. App. 2d 256, 264–268).

42

*Conway*, 231 Cal. App. 4th at 1015 (parallel citations omitted).

In applying § 820.2, a court must make determinations regarding "the category into which the particular act falls: *i.e.*, whether it was ministerial because it amounted only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own, or discretionary because it required 'personal deliberation, decision and judgment." *McCorkle v. City of Los Angeles*, 70 Cal. 2d 252, 260-61 (1969). Critically, immunity may not be based solely on grounds that "the affected employee's general course of duties is discretionary." *Caldwell v. Montoya*, 10 Cal. 4th 972, 983 (1995) (internal citations and quotations omitted). Rather, the affirmative defense of discretionary immunity "requires a showing that the specific conduct giving rise to the suit involved an <u>actual</u> exercise of discretion, *i.e.*, a conscious balancing of risks and advantages." *Id*. While "a strictly careful, thorough, formal, or correct evaluation" is not required, the party seeking immunity must have made an "actual, conscious, and considered collective policy decision...." *Id*.

*Conway*, 231 Cal. App. 4th at 1018-19, provides an excellent summary of the caselaw applied to a reasonably analogous situation. In *Conway*, a SWAT team responded to a report of a known felon firing shots at his roommate. *Id*. at 1009-10. A standoff ensued, and initial efforts to resolve the situation peacefully proved unsuccessful. *Id*. at 1010. The officer who requested the SWAT team then reviewed the offender's criminal history and requested permission to deploy tear gas canisters to resolve the standoff. *Id*. The SWAT team deployed the tear gas, broke down the front door, ignited a flash bang device, and entered the house. *Id*. No one was inside. *Id*. They later found the shooter in another area. *Id*. at 1011. The tear gas residue, however, could not be removed from the residence, rendering it uninhabitable. *Id*. The owner, George, sued for negligence. *Id*. Defendants contended they were immune from liability pursuant to § 802.2.

In reviewing the assertion of immunity, California's Fifth District Court of Appeal examined several cases applying these standards to police conduct. Its explanations and reasoning are worth

43

considering in full detail:

In *McCorkle*, a police officer was called to the scene of an automobile accident. On his arrival, he talked to the plaintiff, who was involved in the accident, on the corner of the intersection. Without setting out flares or interrupting the sequence of the traffic signals, the officer walked to the center of the intersection, followed by the plaintiff, and asked the plaintiff to show him the skidmarks. The plaintiff was struck by an automobile that entered the intersection on a green light and later sued the officer and others for negligence. (*McCorkle*, supra, 70 Cal.2d at pp. 255, 259–260.) The jury found in the plaintiff's favor and against the City of Los Angeles. (*Id*. at p. 255.) [The California] Supreme Court rejected the city's argument that the officer was immune from liability under section 820.2. (*McCorkle*, *supra*, at pp. 260–262.) *** The court concluded that, even if the officer exercised his discretion in undertaking the accident investigation, "section 820.2 did not clothe him with immunity from the consequence of his negligence in conducting it. He would have been immune if plaintiff's injury had been the result of [the officer's] exercise of discretion. [Citations.] It was not: it resulted from his negligence after the discretion, if any, had been exercised." (*McCorkle*, *supra*, 70 Cal.2d at pp. 261–262.) The court [also] held that, because there was no causal connection between the exercise of discretion and the injury, statutory immunity did not apply. (*Id*. at p. 262.)

In *Bratt*, police officers decided to pursue a fleeing vehicle through city streets; during the pursuit, the car the officers were chasing collided with another vehicle. The occupants of that vehicle sought damages for personal injuries and wrongful deaths that occurred in the collision. (*Bratt*, *supra*, 50 Cal.App.3d at p. 552.) On appeal from a judgment of nonsuit in favor of the City and County of San Francisco, the Court of Appeal, noting that the only police conduct that caused the accident was the decision to pursue the fleeing vehicle, held that decision to be a discretionary act protected by section 820.2. (*Bratt*, supra, at p. 553, 123 Cal.Rptr. 774.) The court found the case distinguishable from *McCorkle*, as in *McCorkle* there was no causal connection between the exercise of discretion and the injury, while the only negligence alleged was the "officers' decision to give high speed chase rather than in the officers' execution of that decision." (*Bratt*, supra, at p. 554, 123 Cal.Rptr. 774.)

George asserts these cases demonstrate that only the decision to deploy the SWAT team, not the SWAT team's conduct after being deployed, is entitled to immunity. But, as explained in *Watts*, George relies on the false assumption that once police decide to intervene in a dispute, any subsequent action by the police is ministerial. (*Watts*, supra, 136 Cal.App.3d at p. 235.) Instead, each decision must be examined to determine whether it constitutes a discretionary or ministerial decision. In this case, the decision to use tear gas resulted from choices and judgments made in response to changing circumstances; it was not made in blind

obedience to orders. The difference between this case and *McCorkle* is
that here, the decision to use tear gas was based on personal deliberation,
decision and judgment, while asking the plaintiff in *McCorkle* to come
into the intersection involved no such deliberation, decision, or judgment.

The other cases upon which George relies do not compel a different result.
In *Bell*, the appellate court held that officers who executed an arrest
warrant on the wrong person, without a reasonable basis for concluding
the arrestee was the man they sought, were not entitled to discretionary
immunity under section 820.2 because they did not exercise the level of
discretion required for immunity to apply, as their actions did not involve
an actual exercise of discretion, i.e., a conscious balancing of risks and
advantages, or constitute a basic policy decision. (*Bell*, supra, 63
Cal.App.4th at p. 929.) In *Gillan*, the appellate court held section 820.2
immunity did not apply to the police's decision to arrest the plaintiff,
which was found to be without probable cause, as that decision "was not a
basic policy decision, but only an operational decision by the police
purporting to apply the law." (*Gillan*, supra, 147 Cal.App.4th at p. 1051.)
In *Ogborn v. City of Lancaster* (2002) 101 Cal. App. 4th 448, the plaintiffs
sued the city and individual city officials for various claims arising out of
the city's demolition of their rented home and its contents as part of a
nuisance abatement program. (*Id*. at p. 453.) The appellate court held that
the city employee charged with administering the program, who conducted
a hearing at which the property on which the house sat was declared a
public nuisance and sent a letter to that effect, was immune under section
820.2 because his participation was limited to making the discretionary
policy decision to declare the property a nuisance. (*Ogborn*, supra, at p.
461.) The appellate court, however, held the code enforcement officer who
actively participated in the implementation of the program with respect to
the property by giving the order for the bulldozer to demolish the
plaintiffs' house and all their belongings was not immune because his
actions constituted subsequent ministerial actions implementing the basic
policy decision to declare the property a nuisance. (*Id*. at pp. 454, 455–
456.) We find the decisions made in the present case very different from
the ones in these cases. The arrest of a suspected armed assailant mandates
decisions affecting public safety; liability for such split-second decisions
conceivably could hamstring officials with unpleasant results. George
argues that by extending immunity in this case, every action by an officer,
no matter how minor, will be subject to immunity as long as the officer
states he or she made a choice between two options. Our decision,
however, is not that broad. We hold only that, given the importance of the
decisions involved and the potential impact of liability on these decisions,
section 820.2 provides immunity for the officers' actions here under the
authority set forth in *Caldwell*.

*Conway*, 231 Cal. App. 4th at 1018-20 (parallel citations omitted).

The situation here is not precisely analogous. Among other things, the efficient execution of a

45

Writ of Possession, while an important aspect of civil process, is not nearly as important to society as the arrest of a suspected armed assailant. Nonetheless, the Court believes it is appropriate to apply § 802.2 immunity to some of the acts at issue in this case.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

The only remaining act for which Martinez could be liable is his decision to allow the eviction to proceed under normal protocols, as opposed to proceeding with the use of a more tactical response. However, the undisputed evidence suggests this was the product of deliberation. Martinez reviewed the information on the trip ticket, told Juarez to highlight it, and deliberately did not direct the use of a tactical team, instead permitting the Deputies assigned to make that call because facts on the ground were pertinent to the decision-making. *See generally* Martinez Depo at 41-41. This was, in effect, a deliberate policy decision to defer tactical decision-making to the Deputies in the field. The Court cannot find any basis upon which to meaningfully distinguish this situation from those in which § 802.2 immunity applied. Martinez's motion for summary judgment on Plaintiffs' negligence claim is GRANTED.[23]

With respect to Paris and Glinskas, the Court breaks the eviction down into the following separate events, as described by Defendants Paris and Glinskas:

> (1) the initial contact [with Engert] in front of the property, (2) the
> approach to the property, (3) indicating Plaintiff to the side during the
> initial assessment and announcement, and then commencement of the
> eviction, and (4) pointing Plaintiff to the side a second time during the

---

[23] Plaintiffs argue that Defendants may not avail themselves of § 820.2 immunity where there is no causal connection between the exercise of discretion and the injury. Doc. 182 at 48. Here, the Court has applied only this form of immunity to acts that are causally connected to the injury. Plaintiffs, in fact, argue repeatedly that these acts are causally connected to the injury.

investigation of the unidentified noise, and resumption of the eviction.

Doc. 102 at 21.

As to the initial contact with Engert, Plaintiffs assert that Paris and Glinskas failed to provide appropriate warnings to Engert about the dangers associated with the eviction. California courts have held that "the decision to warn or not warn of foreseeable, latent dangers does not rise to the level of a basic police decision" entitled to immunity under § 820.2. *Wallace v. City of Los Angeles*, 12 Cal. App. 4th 1385, 1403 (1993) (footnote omitted). In *Wallace*, for instance, the court held that a detective's "decision to offer [a woman] to the district attorney as a prosecution witness may have been a discretionary one . . . [but] his subsequent decisions to refrain from warning her about the danger associated with her role as witness and refrain from offering her protection were not." *Id.* at n.10. The Court therefore finds that, as a matter of law, a failure to warn is not protected by § 820.2 immunity and Paris's and Glinskas's motion for summary judgment that they are entitled to § 820.2 immunity with respect to any failure to warn claim is DENIED.

The second and third steps -- the approach to the Property and the first invitation to Engert to begin drilling the door -- can be treated together. The undisputed evidence indicates that Glinskas and Paris reviewed the trip ticket and decided to approach the eviction on their own. Glinskas Depo. at 99:5-14 (Glinskas indicating that he and Paris discussed that if the resident started talking about the military, Glinskas would "take the conversation" and discuss "his options as a military veteran"). Their first approach to the house, the knock and announce, and the invitation of Engert to the door in the first instance were all in accordance with this general plan. Apart from the discretionary decision to approach the eviction without further tactical support, nothing in the record, including the testimony of Plaintiff's expert, indicates that Paris and Glinskas acted inappropriately or breached any duty to Engert. *See generally* Deposition of Ken Katsaris (indicating throughout that an entirely different tactical approach should have been used for this eviction and that Paris and Glinskas should have retreated after Engert

47

said he heard a something inside, but never indicating that, apart from the tactical strategy employed, the initial approach was performed in an unreasonable manner).[24] Paris's and Glinskas's motion for summary judgment that they are entitled to § 820.2 immunity for their initial approach to the Property and the first invitation to Engert to begin drilling the door is GRANTED.

The result is different as to the final step: Paris's and Glinskas's actions <u>after</u> Engert indicated that he heard a noise coming from the inside of the property. "There is no immunity 'if the injury . . . results, not from the employee's exercise of discretion vested in him to undertake the act, but from his negligence in performing it after having made the discretionary decision to do so." *Martinez*, 141 F.3d at 1379. Assertion of § 820.2 immunity is an affirmative defense for which Defendants bear the burden of proof. *See DeJung v. Superior Court*, 169 Cal. App. 4th 533, 538 (2008) (characterizing defense provided by § 820.2 as "affirmative defense of discretionary immunity"). Defendants have failed to point to evidence demonstrating that Paris and/or Glinskas engaged in any deliberation, let alone deliberation related to an "actual, conscious, and considered collective policy decision" in connection with their actions after Engert indicated he heard something inside the house. Paris's and Glinskas's motion for summary judgment that they are entitled to § 820.2 immunity for their actions after Engert indicated he heard something inside the house is DENIED.

### 4.    <u>Elements of Negligence.</u>

To prevail on a claim of negligent wrongful death, a plaintiff must establish: (1) existence of a duty; (2) breach of that duty; (3) causation (actual and proximate); and (4) damages. *Friedman v. Merck & Co*., 107 Cal. App. 4th 454, 463 (2003). Defendants maintain that they owed Engert no duty of care; that they did not breach any duty of care; and that there is no causal connection between any breach and

---

[24] The Court previously indicated that it would not rule on Defendants' objections to Plaintiff's reliance on the Katsaris Declaration because it had not relied on the declaration. *See supra* note 8. The Court is nevertheless referencing Katsaris's testimony here, but in a manner that Defendants could not possibly find objectionable, namely, to demonstrate the absence of a particular type of evidence therein.

Engert's death.

    **a.**  **Duty & Breach.**

     **(1)**  **Special Relationship.**

  As noted above, Plaintiffs argue there was a "special relationship" between Engert and the Deputies. *See supra* n. 14. Plaintiffs rely on *Peterson v. San Francisco Cmty. Coll. Dist.*, 36 Cal. 3d 799, 806 (1984), for general the proposition that where a "special relationship" exists between a public employee and a civilian, that civilian is entitled to warning and protection. In *Peterson*, a student at City College of San Francisco was assaulted while ascending a stairway in the school's parking lot. *Id.* at 805. The California Supreme Court concluded that the school, a public entity, owed the student a duty of care because the school was a "possessor of land who holds it open to the public for entry for business purposes" and therefore had a "special relationship" with the student. *Id.* at 806-807.

  As Defendants were not in possession of the Property (*i.e.*, the locale of Engert's injury), *Peterson* is not analogous. A somewhat more relevant case is *Walker v. County of Los Angeles*, 192 Cal. App. 3d 1393 (1987). In *Walker*, a county animal control officer asked appellant to assist her in capturing an abandoned dog after she was unable to catch the dog on her own. *Id.* at 1395. Appellant consented, and was injured in his attempt to catch the dog. *Id.* He then brought an action for negligence against the county, alleging that he was owed a duty of due care in connection with his assistance. *Id.* at 1396. The court agreed, finding that a special relationship existed between Walker and the county, based on the county officer's request for assistance in the performance of a dangerous task, which was part of the officer's official duties. *Id.* at 1402-403.

  In *Mann v. State of California*, a special relationship based on dependency was found. 70 Cal. App. 3d 773 (1977). There, a California Highway Patrolman came to the aid of a stranded motorist and placed their car with flashing lights behind two cars stalled on the freeway. *Id.* at 776. After calling the tow truck, the officers withdrew without warning; they did not wait for the tow truck to line up behind

the stalled car or provide the alternative protection of flares. *Id*. at 776-77. Minutes later, one of the stalled cars was sideswiped by a passing car and the persons nearby were injured. *Id*. at 777. Because the officers stopped to investigate and took affirmative steps to provide assistance, a special relationship existed. *Id*. at 780. When the California Supreme Court later examined *Mann*, it concluded that a special relationship had existed in *Mann* because the Highway Patrolman had "lull[ed] the injured parties into a false sense of security and perhaps prevent[ed] other assistance from being sought." *Williams v. State of California*, 34 Cal. 3d 18, 25 (1983).

Likewise, a special relationship existed in *Wallace*, in which a detective had a witness sign a statement implicating a suspect in a murder, without warning her that the suspect had been threatening witnesses. 12 Cal. App. 4th at 1388-92. The witness was later murdered. *Id*. at 1392. As a pre-requisite to finding any duty existed, the *Wallace* court found that there was a special relationship between the witness and defendants because defendants "enlisted [the witness] to be a prosecution witness... and [that role] carried with it a foreseeable risk of harm." *Id*. at 1400-01.

A different result was reached in *Hernandez v. City of Pomona*, which concerned a witness who was knowledgeable of the risks of testifying against others because he was himself a gang member. 49 Cal. App. 4th 1492, 1503-505 (1996). The *Hernandez* court reasoned that, unlike in other cases in where there was evidence or allegations that the defendants induced a false sense of security, there was no special relationship between the gang member witness and the police because the gang member was fully aware of the risks associated with testifying against fellow gang members, and never even alleged that any action by the police induced a false sense of security. *Id*. at 1502.

Here, the facts are most closely analogous to *Mann*. Unlike the witness in *Wallace* or the citizen in *Walker*, Engert was not "enlisted" to aid Defendants in the eviction. He was there at the direction of the Property owner. But, once Defendants decided to engage in the eviction with Engert present, Defendants essentially were aiding Engert in his efforts by, among other things, attempting to make the

scene safe for him to do his work. This is like the Highway Patrolman in *Mann*, who came to the motorists' aid and then allegedly acted in an unreasonable manner by acting to leave the motorists in a more dangerous situation than the one in which they found the motorists. Likewise, a reasonable juror could conclude, based on the present record, that Defendants' actions lulled Engert into a false sense of security, thereby creating a special relationship between Defendants and Engert. Therefore, Defendants are not entitled to summary judgment on the issue of the existence of a special relationship.

### (2)     Duty to Warn.

Plaintiffs assert that, in light of the special relationship between Defendants and Engert, Defendants owned Engert a duty to warn. The Wallace court reviewed a number of cases related to the duty to warn:

> [A] duty to warn was found in *Johnson v. State of California* (1968) 69 Cal.2d 782, where the California Youth Authority placed a minor in the foster care of the plaintiff and her husband. The minor had homicidal tendencies and a background of cruelty and violence to persons and animals, but the Johnsons were not warned about him. The minor attacked the plaintiff soon after moving into her home.
>
> In contrast, no duty to warn was found in *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, where a child was killed by a juvenile offender who was prone to violence against young children and who, prior to his release to his mother's care from a county institution, had threatened to kill a young child residing in his mother's neighborhood. The juvenile offender gave no indication of which child he intended as his victim. The defendant county did not warn the local police nor persons in the mother's neighborhood of these facts. In comparing the case before it with the *Johnson* case, the *Thompson* court stated: "In Johnson we emphasized the relationship between the state and plaintiff-victim, and the fact that the state by its conduct placed the specific plaintiff in a position of clearly foreseeable danger. In contrast with the situation in *Johnson*, in which the risk of danger focused precisely on plaintiff, here County bore no special and continuous relationship with the specific plaintiffs nor did County knowingly place the specific plaintiffs' decedent into a foreseeably dangerous position. Thus the reasoning of our holding in *Johnson* would not sustain the complaint in this action." (*Id*. at p. 751.)
>
> Likewise, the court in *Davidson v. City of Westminster*, supra, 32 Cal.3d 197, found that the defendants in that case had no duty to warn. In *Davidson*, the plaintiff had been stabbed in a laundromat which the police

had under surveillance at the time of the stabbing. Three stabbings had taken place at the same or nearby laundromats and the police had been watching their suspect in the laundromat on the night that plaintiff was stabbed by him. The police knew that the plaintiff was inside the laundromat but did not warn her about their suspect. The *Davidson* court contrasted the case before it with the facts in *Johnson*, emphasizing that in the *Johnson* case, "the state put the parolee in the victim's home and failed to warn of homicidal tendencies; thus the state placed the victim in danger. Here the police were in no way responsible for the presence of either the assailant or the victim in the laundromat." (*Id.* at p. 207.)

*Wallace*, 12 Cal. App. 4th at 1396-97 (parallel citations omitted). In light of these cases, a duty to warn was found in *Wallace* because "the government's actions create[d] a foreseeable peril to a specific foreseeable victim, ... when the danger is not readily discoverable by the endangered person." The *Wallace* court reasoned that the detective had "created a foreseeable peril for [the witness], a peril that was not readily discoverable by her," by having her sign the witness statement and determining that she would testify at trial. *Id.* at 1396-97. "Thereafter, she was in a position of peril. It was a peril not of her own making, for unlike the laundromat assault victim in *Davidson* who had come to her peril of her own accord and without any instigation by the police [the witness] was pursued by [the detective], a person seeking to make a murder case against [the suspect]." *Id.* at 1397-98.

In contrast, in *Hernandez*, the plaintiff, a gang member, "was wholly aware of the danger he faced [in testifying against fellow gang members], perhaps more fully comprehending the extent of that danger than did the police or prosecutor." 49 Cal. App. 4th at 1501-02. Thus, *Hernandez* did not present a case concerning the duty to warn. *Id.* at 1502.

Here, the facts fall somewhere in between *Wallace* and *Hernandez*. The undisputed evidence indicates that Roberts informed Engert that the occupant might be an "armed weirdo" or "armed wacko," but the extent of Engert's knowledge as to the details of the threats articulated in the trip ticket are not clear on the present record. Absent undisputed evidence that Engert was fully aware of the risks, the Court will not apply *Hernandez* to bar a failure to warn claim.

Defendants argue that no duty to warn exists in this case because, unlike in *Wallace*, Paris and

52

Glinskas did not create a risk to Engert. That argument has been addressed and rejected above in the context of the danger creation doctrine. A reasonable jury could find that Paris's and Glinskas's conduct – by inviting Engert to approach the door the second time – created a foreseeable peril that was not readily foreseeable by Engert. There is also sufficient evidence in the record to support a finding that Paris and Glinskas breached the duty to warn Engert. The extent of Engert's knowledge of the warnings provided to law enforcement is disputed.

### (3) Duty to Protect.

Plaintiffs suggest that a "duty to protect" also applies here. Doc. 182 at 44. *Peterson* held that a public entity landowner had a "duty to protect [] and/or warn" students who used its parking lot. 36 Cal.3d. at 804. More specifically, the public entity had a duty to "take reasonable protective measures to ensure [a] [p]laintiff's safety against violent attack from foreseeable criminal conduct and/or to warn her as to the location of prior violent assaults in the vicinity of the subject parking lot and stairway." *Id*. at 805. But the duties to protect in that case arose from the public entity's role as a landowner. *See id*. at 806-807. *Wallace* and *Carpenter v. City of Los Angeles* stand for the proposition that the duty to warn may be extended to public entities in certain situations other than those arising under the landowner/invitee relationship where the public entity creates a peril. *See Wallace*, 12 Cal. App. 4th at 1396-97 (finding a duty to warn where the public entity created a risk of peril to witness by involving her in prosecution of suspect who police knew posed a threat to the witness); *Carpenter,* 230 Cal. App 3d 923, 931-35 (1991)(same). Neither *Wallace* nor *Carpenter* addressed whether a duty to protect existed in those circumstances. *See Hernandez*, 49 Cal. App. 4th at 1502.

The closest case that actually applied a duty to protect is *Walker v. Cnty. of Los Angeles*, 192 Cal. App. 3d 1393 (1987). In *Walker*, a county animal control officer asked appellant to assist her in capturing an abandoned dog after she was unable to catch the dog on her own. *Id*. at 1395. Appellant consented, and was injured in his attempt to catch the dog. *Id*. He then brought an action for negligence

against the county, alleging that he was owed a duty of due care in connection with his assistance. *Id*. at 1396. The court agreed, finding that a special relationship existed between Walker and the county, based on the county officer's request for assistance in the performance of a dangerous task, which was part of the officer's official duties. *Id*. at 1402-403.

*Hernandez*, which concerned a witness who was knowledgeable of the risks of testifying against others because he was himself a gang member, distinguished *Walker* on the ground that, in *Walker*, the plaintiff was asked to assist the officer, whereas the gang member witness in *Hernandez* was subject to being compelled to appear as a witness pursuant to subpoena. 49 Cal. App. 4th at 1504.

> [I]t is a duty of citizenship in this country to assist law enforcement in the prosecution of crimes, as evidenced by the government's power to subpoena witnesses to appear and testify at trial. The benefit citizens derive from this arrangement is the enjoyment of living in a society which actively and effectively prosecutes crimes. The duty on the part of citizens to assist in criminal prosecution does not, however, give rise to a right to protection on demand. In a perfect world, that right would be assured, but law enforcement and government agencies charged with investigating and prosecuting crimes must instead operate in a world of budgetary constraints and limited resources.

*Id*. The analysis in *Hernandez* is an example of what the California Supreme Court discussed in *Peterson*:

> "[D]uty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection."

36 Cal. 3d at 805-06. "Whether a duty of care exists is a question of law for the court. Also, whether, and the extent to which, a new duty is recognized is ultimately a question of public policy." *See Jones v. Grewe*, 189 Cal. App. 3d 950, 954 (1987). Plaintiffs have not provided any argument or authority to support a public policy analysis that would suggest a "duty of protection" akin to that applied in *Walke*r should apply here. *Walker* is at least arguably distinguishable, as it concerned a public official who requested the assistance of the plaintiff, rather than, as is the case here, a situation in which Engert's assistance was requested by the owner of the Property. Under these circumstances, the Court declines to

54

expand the reach of the duty to protect. *See Hochendoner v. Genzyme*, ___ F. Supp. 3d ___, 2015 WL 1333271 *11 (D. Mass., March 25, 2015) ("A federal court sitting in diversity cannot be expected to create new doctrines expanding state law."). In any event, this conclusion is of little practical import to Plaintiffs' case in light of the undisputed existence of a substantially similar duty not to expose others to an unreasonable risk of injury at the hands of third parties.

### (4)   Duty Not to Expose to Unreasonable Risk of Injury at the Hands of Third Parties.

There does exist a separate duty "not to expose others to an unreasonable risk of injury at the hands of third parties." *Lugtu v. California Highway Patrol*, 26 Cal. 4th 703, 717 (2001). For example, "California cases uniformly hold that a police officer who exercises his or her authority to direct another person to proceed to-or to stop at-a particular location, owes such a person a duty to use reasonable care in giving that direction, so as not to place the person in danger or to expose the person to an unreasonable risk of harm." *Id*. No defendant suggests that this duty does not apply here; they only argue that they did not place Engert in danger or expose him to an unreasonable risk of harm. *See* Doc. 102 at 21 (citing *Lugtu*, 26 Cal.4th 703). As discussed above, a reasonable jury could find for Plaintiffs on these issues. That is all that is required to establish breach of this duty for purposes of summary judgment.

> The benefit citizens derive from this arrangement is the enjoyment of living in a society which actively and effectively prosecutes crimes. The duty on the part of citizens to assist in criminal prosecution does not, however, give rise to a right to protection on demand. In a perfect world, that right would be assured, but law enforcement and government agencies charged with investigating and prosecuting crimes must instead operate in a world of budgetary constraints and limited resources.
>
> ***
>
> If law enforcement agencies were held to owe a duty to protect every witness who is fearful of reprisal, with attendant liability for failure to do so, one can easily suppose that criminal investigations will be inhibited from the outset. Law enforcement officials will hesitate to question potential witnesses without first determining whether the funds exist to protect them. These and other considerations compel the conclusion that

> absent a specific undertaking to protect a witness, there is no duty to do so
> in the course of investigating and prosecuting criminal activity.

*Id*. at 1504-05. Under these circumstances, the Hernandez court declined to impose a duty to protect.

Accordingly, as to both the duty to warn and the duty not to expose others to an unreasonable risk of injury at the hands of third parties, the record precludes summary judgment as to duty and breach.

### b.   **Causation.**

Defendants next argue that the actions of Paris and Glinskas were neither the cause-in-fact nor the proximate cause of Engert's injuries. "Legal cause exists if the actor's conduct is a substantial factor in bringing about the harm and there is no rule of law relieving the actor from liability," while "[t]he doctrine of proximate cause limits liability; *i.e.*, in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because of the manner in which the injury occurred." *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 665-66 (2001), *as modified on denial of reh'g* (Sept. 12, 2001) (internal citations and quotations omitted). "Thus, where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the legal or proximate cause." *Id*. at 666.

With regard to the two remaining theories of negligence liability—failure to warn and breach of the duty not to expose others to an unreasonable risk of injury at the hands of third parties in connection with the second approach to the Property—the record could support a finding that Paris's and Glinskas's conduct was a substantial factor in causing Engert's injuries. If Engert was not aware of all the information possessed by Paris and Glinskas, informing him of the additional information could have altered the outcome because Engert might not have agreed to participate in the eviction. Likewise, a reasonable jury could infer from the record that, had Paris and Glinskas acted differently after Engert indicated he heard a noise in the house (*e.g.*, by modifying the tactical response to the eviction, or finding some other method that did not require Engert to approach the residence until it was made secure), Engert might not have died.

1

2

3

Likewise, the record can support a finding that Paris's and Glinskas's conduct was the proximate cause of Engert's death. For the reasons discussed above in the analysis of the danger creation claim, a reasonable jury could conclude that Ferrario's actions were foreseeable.

4

5

6

7

8

9

10

11

Defendants next maintain that Ferrario's act was a superseding cause that absolves Paris and Glinskas of liability. Doc. 102-1 at 22. However, where an intervening act by a third party was foreseeable, it does not amount to a superseding cause relieving the negligent defendant of liability. *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1208 (9th Cir. 2003) (citing California law); *Vasquez v. Residential Investments, Inc.*, 118 Cal. App. 4th 269, 289-90 (2004) ("[T]he defendant need only foresee the risk of harm, not the particular intervening act ... and where the risk created by the breach of the duty is that the plaintiff is exposed to danger from criminal conduct, the criminal conduct is not automatically a superseding cause."). As the California Supreme Court observed in *Lugtu*:

12

13

14

15

> It is well established that when a defendant's negligence is based upon his or her having exposed the plaintiff to an unreasonable risk of harm from the actions of others, the occurrence of the type of conduct against which the defendant had a duty to protect the plaintiff cannot properly constitute a superseding cause that completely relieves the defendant of any responsibility for the plaintiff's injuries.

16

26 Cal.4th at 725.

17

18

Defendants' motion for summary judgment as to the causation element of Plaintiffs' negligence claim is DENIED.

19

20

**5.    Cal Gov. Code § 845.**

21

22

Defendants argue that they are immune from liability pursuant to California Government Code Section 845 ("§ 845")[25], which provides: "Neither a public entity nor a public employee is liable for

23

24

25

---

[25] Paris and Glinskas do not actually assert this form of immunity in their motion. *See* Doc. 102-1. Because the other sets of Defendants do so, *see* Doc. 131 at 25 & Doc. 130-8 at 24, and because the County's ultimate liability turns on the liability of its employees, Cal. Gov. Code § 815.2, the Court addresses the issue.

failure to establish a police department or otherwise provide police protection service or, if police

protection service is provided, for failure to provide sufficient police protection service." As discussed

above, while this provision does provide immunity against claims that are narrowly confined to requests

for additional police protection, *Carpenter* suggests that related claims, such as claims based upon a

police officer's failure to warn, are not barred by § 845. 230 Cal. App. 3d at 934-35. Other cases suggest

that § 845 would not bar claims based upon a duty to avoid exposing others to an unreasonable risk of

injury at the hands of third parties. *See Hearn v. Los Angeles Sch. Police Dep't*, No. B238195, 2013 WL

5209874, at *7 (Cal. Ct. App. Sept. 17, 2013) (refusing to apply immunity under § 845 where a claim

can proceed in connection with affirmative acts to increase the risk of harm to the plaintiff).[26]

Relatedly, the California Supreme Court has interpreted § 845 to "merely immunize[] a public

entity's or employee's 'political decision' concerning the extent to which police protection should be

provided." *Williams v. State of California*, 34 Cal.3d 18, 35 (1983) (quoting § 845). *Lopez v. S. Cal.*

*Rapid Transit Dist.*, 40 Cal.3d 780, 792 (1985), reviewed the legislative history of § 845:

> The Law Revision Commission comment to Government Code section
> 845 explains the policy considerations underlying that section: "This
> section grants a general immunity for failure to provide police protection
> or for failure to provide enough police protection. Whether police
> protection should be provided at all, and the extent to which it should be
> provided, are political decisions which are committed to the policy-
> making officials of government. To permit review of these decisions by
> judges and juries would remove the ultimate decision-making authority
> from those politically responsible for making the decision." As we
> recently explained in *Peterson v. San Francisco Community College*
> *District,* supra, 36 Cal.3d at page 815, the immunity provided in section
> 845 "is meant to protect the budgetary and political decisions which are
> involved in hiring and deploying a police force."

The *Lopez* court reasoned that § 854 is "essence a discretionary immunity statute." *Id*. at 806. "As such

---

[26] Although this is an unpublished opinion of the California Court of Appeal, *see* California Rule of Court 977(a), the court
may consider its reasoning. *See Jerry Beeman and Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., LLC*, 652 F.3d 1085,
1093 (9th Cir. 2011) ("Defendants correctly argue that we are not precluded from considering these unpublished decisions as
a possible reflection of California law, although they have no precedential value.").

it should be given the same restricted scope as section 820.2; affording immunity only for basic policy decisions. *Id.* (internal citation and quotation omitted). Therefore, even if § 845 encompassed claims based upon the duty to warn and the duty not to expose others to an unreasonable risk of harm at the hands of third parties, the statute would not be triggered here for the same reason the remaining negligence claims did not trigger application of § 820.2 immunity: they did not involve discretionary acts.

### 6.   Cal. Gov. Code § 821.6.

Finally, Defendants assert they are immune under California Government Code § 821.6 ("§ 821.6"), *see* Doc. 102-1 at 24, which provides that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Defendants maintain that service and enforcement of a Notice of Restoration is akin to prosecuting in a judicial proceeding. In support of their assertion that § 821.6 applies in this case, Defendants cite *Amylou R. v. Cnty. of Riverside*, 28 Cal. App. 4th 1205, 1209 (1994), which applied § 821.6 immunity to officers who were accused of misconduct committed in the course of investigating crimes. At issue in *Amylou* was whether investigatory activity was covered by § 821.6. *Id.* at 1209-10. *Amylou* held that § 821.6 "is not limited to the act of filing a criminal complaint. Instead, it also extends to actions taken in preparation for formal proceedings." *Id.* Since the acts of which Amylou complained were "incidental to the investigation of the crimes, and since investigation is part of the prosecution of a judicial proceeding, those acts were committed in the course of the prosecution of that proceeding." *Id.* at 1211. "[T]he test of immunity is ... whether there is a causal relationship between the [action] and the prosecution process." *Ingram v. Flippo*, 74 Cal. App. 4th 1280, 1293 (1999).

Defendants cite no authority for the proposition that service of a Notice of Restoration is akin to investigative activities incidental to prosecution of a criminal case. Rather, California Code of Civil

Procedure § 712.020 provides that "writ of possession or sale ... shall require the levying officer to whom it is directed to <u>enforce the judgment</u>...." (emphasis added). A prosecutor might be entitled to absolute immunity for taking steps to bring a judicial action to enforce a prior court judgment, *see Schoggins v. San Bernardino Cnty. Bd. of Supervisors*, No. E030156, 2002 WL 258209, at *3 (Cal. Ct. App. Feb. 25, 2002) (applying § 821.6 to bar claim against deputy district attorney for bringing and underlying action to enforce child support order); *Dorsey v. Orloff*, No. C 96-3587 FMS, 1997 WL 85016, at *3 (N.D. Cal. Feb. 24, 1997), *aff'd*, 131 F.3d 146 (9th Cir. 1997) (applying absolute prosecutorial immunity to bar federal claim based upon initiation of judicial proceedings to enforce child support order). However, the California Court of Appeal for the Second District found § 821.6 inapplicable to tort claims brought against a code enforcement officer pertaining to conduct that took place during the enforcement of a nuisance abatement warrant because the conduct occurred after the judicial procedure he initiated to obtain the warrant was complete. *Ogborn v. City of Lancaster*, 101 Cal. App. 4th 448, 462 (2002). The circumstances in this case are akin to those in *Ogborn*. The unlawful detainer action resulted in a judgment, and therefore was complete by the time the Notice of Restoration was enforced. Section 821.6 immunity does not apply here.

Defendants' motion for summary judgment that the remaining state law tort claims in this case are barred by § 821.6 is DENIED.

Because the County is vicariously liable for the torts of its employees performed within the scope of employment unless that employee is immune from liability, Cal. Gov. Code § 815.2, the County remains a defendant in this case.

## V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

    (1) Defendant Harper's motion for summary judgment is GRANTED IN ITS

        ENTIRETY;

(2) the County's motion for summary judgment is GRANTED IN PART AND DENIED IN PART, as it remains vicariously liable for its non-immune employees under state law;

(3) Defendant Martinez's motion for summary judgment is GRANTED IN PART AND DENIED IN PART; and

(4) Defendants Paris's and Glinskas's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

SO ORDERED
Dated: May 29, 2015

/s/ Lawrence J. O'Neill
United States District Judge

61